IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

CITY OF HURRICANE, WEST VIRGINIA and
THE COUNTY COMMISSION OF PUTNAM
COUNTY, WEST VIRGINIA,

          Plaintiffs,

v.                                            CIVIL ACTION NO. 3:14-15850

DISPOSAL SERVICE INCORPORATED,
a West Virginia Corporation and
WASTE MANAGEMENT OF WEST VIRGINIA,
INCORPORATED, a Delaware Corporation,

          Defendants.

**MEMORANDUM OPINION AND ORDER**

On October 28, 2014, Defendants Disposal Service, Incorporated ("DSI") and Waste Management of West Virginia, Incorporated ("WMWV"), moved for a temporary restraining order or preliminary injunction enjoining Plaintiff City of Hurricane ("the City") from enforcing the "Notice of Threatened Violation of Section 935.27 of the Municipal code of the City of Hurricane WV, arising out of disposal activities at the DSI Landfill in Hurricane, WV." ECF No. 36. This Court entered a temporary restraining order the following day and directed the parties to schedule a hearing to consider whether a preliminary injunction should be granted. ECF No. 38. On November 18, 2014, the City moved to vacate the temporary restraining order. ECF No. 40. By order of the Court, on December 3, 2014 Defendants responded to the City's motion to vacate. ECF No. 50. On December 4, 2014, the Court held a hearing to consider whether a preliminary injunction is justified. For the following reasons, Defendants' Motion for a Preliminary

Injunction is **DENIED** and Plaintiff's Motion to Vacate the Temporary Restraining Order is **GRANTED**.

### I. Background

In the underlying suit bringing these parties before the Court, Plaintiffs allege that Defendants improperly and unlawfully disposed of hazardous wastes and solid wastes in Hurricane, West Virginia, at a landfill owned and operated by DSI and also operated by WMWV ("DSI Landfill"). Specifically, Plaintiffs allege improper disposal of three commercial chemicals: "Crude MCHM" (a chemical mixture containing methanol), propylene glycol phenyl ether ("PPH"), and dipropylene glycol phenyl ether ("DiPPH"). Naming six causes of action, Plaintiffs seek various types of relief including declaratory relief, injunctive relief, restitution, and costs.

Under Count One, Plaintiffs bring a citizen suit against Defendants pursuant to § 7002(a)(1)(B) of the federal Recourse Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., for contributing to the present disposal of solid and hazardous waste in violation of RCRA Subtitle C thereby presenting an imminent and substantial engenderment to health or the environment. Amd. Compl. ¶¶ 63–88. Under Count Two, Plaintiffs bring a citizen suit against Defendants pursuant to § 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6901 et seq., for, among other allegations, contributing to the present disposal of statutory solid and hazardous waste which may present an imminent and substantial endangerment to health or the environment. 42 U.S.C. § 6972(a)(1)(B); Amd. Compl. ¶¶ 89–103. Counts Three, Four, and Five allege that Defendants are responsible for a public nuisance under West Virginia law, Article 1135 of the Hurricane, West Virginia, Code of Ordinances, and Putnam County Ordinance Declaring the Storage or Disposal of Designated Hazardous Wastes and Prohibited Hazardous Substances in Putnam County, West

Virginia, to be a Public Nuisance, respectively. Amd. Compl. ¶¶ 104–148. Finally, Count Six alleges that Defendants are liable for the City of Hurricane's abatement action costs under Article 1135 of the Hurricane, West Virginia, Code of Ordinances. Amd. Compl. ¶¶ 149–157.

Plaintiffs bring the RCRA-based claims under the Court's federal question jurisdiction pursuant to 28 U.S.C. § 1331, and allege that the Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over the remaining claims.

The City owns and operates a municipal sanitary sewer system and sewage treatment plant ("Publically Owned Treatment Works" or "POTT"). ECF No. 41 at 3. Among other inputs, that sewage and POTW system receives industrial wastewaters, including leachate from the DSI Landfill. *Id.* After moving through the City's treatment system, water is discharged to Hurricane Creek, pursuant to a permit issued to the City by WVDEP. *Id.* Article 935 sets rates for sewer users and governs terms of use. *Id.*

At some as yet unspecified time after the City knew that potentially hazardous waste had been disposed of at the DSI Landfill, the City Council passed an ordinance amending the Municipal Code and creating a process within Article 935 to identify and address conditions posing a threat to the safe operation of the City's sewer and POTW system, particularly the ability to operate in a manner that adequately protects human health and the environment as required by state and federal law. ECF No. 41 at 3.

Invoking the authority of the amended Article 935, on October 22, 2014, the City sent a Notice of Threatened Violation of Section 935.27 ("NOV") to DSI and WMWV as owners and operators of the DSI Landfill. ECF No. 36-1. The NOV addresses leachate, a liquid waste, from the DSI Landfill that is ultimately disposed through wastewater facilities, including the City's sewer and POTW. *Id.* at 3.

On October 28, 2014, DSI and WMWV, as Defendants in the instant action, moved for a temporary restraining order, pursuant to Federal Rule of Civil Procedure 65(b), and preliminary injunction enjoining the City from enforcing the NOV. ECF No. 36. The Court granted a TRO the following day. ECF No. 38. Shortly thereafter, the City filed a Motion to Vacate the TRO. ECF No. 40. On December 4, 2014, the Court heard oral argument concerning potential issuance of a preliminary injunction and testimony of four witnesses. The matter is now ripe for resolution.

First, witness testimony offered at the hearing will be briefly summarized. Next, the Court will review general framework and key provisions of Article 935, followed by explaining the legal standard for granting a preliminary injunction. Finally, the Court will consider whether Defendants have met each factor in that legal standard.

**II.     Witness Testimony**

Defendants' first witness, Scott Mandirola, works for the WVDEP as the Director of its Division of Water and Waste Management. Through that division, Mr. Mandirola oversaw issuance of Defendant's Solid Waste Permit for the DSI Landfill as well as two permit modifications specifically issued to allow receipt of the waste in question. While Mr. Mandirola had informed opinions of how such waste is characterized and must be handled under RCRA, he had no such knowledge base or opinions on how the same waste is characterized or managed under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). Mr. Mandirola was similarly unfamiliar with any legal requirements governing whether the City is required to receive any materials generated by its users into its sewer and POTW system. Finally, while Mr. Mandirola was steadfast in his judgment that the wastes in question had been properly disposed of at the DSI Landfill consistent with the permit and modifications issued by his office,

he nonetheless acknowledged that, in contrast with the WVDEP permitted method of disposal, the manufacturer of MCHM recommends disposal by incineration.

Defendants' second witness, Adam Finley, works for WMWV as an Engineering Manager responsible for oversight of the DSI Landfill. Mr. Finley explained the construction of the DSI Landfill, particularly features designed to minimize and collect leachate. Mr. Finley also testified that Defendants have observed no MCHM in leachate sampling to date.

Defendants' third witness, Craig Arnold, also works with WMWV, as an Environmental Compliance Manager. Mr. Arnold further explained what sampling has been conducted by Defendants to test for MCHM at the DSI Landfill. To date, all sampling has returned levels of no-detect for MCHM.

Finally, the Court heard from Plaintiff's only witness, City of Hurricane Manager Ben Newhouse. Mr. Newhouse explained that City employees working in the POTW system had noted MCHM-characteristic odors. These workers were advised to wear protective gear and to stay away from the POTW system if necessary to protect their health. While Mr. Newhouse believes such complaints are related to leachate from the DSI Landfill in the City's POTW system, there is no sampling to support that assumption. At present, the City has not noted any damage to the POTW system.

### III. Article 935 Legal Framework

The West Virginia Public Service Commission Tariff governing public utility aspects of the City's sewer and POTW system vests the City's Sanitary and Stormwater Board with the responsibility of determining what materials should be accepted into the system. As explained in the Tariff:

> When an unusual user is to be served, a preliminary study of its wastes, and the cost of transport and treatment thereof, will be made. Waste containing material which,

in the judgment of the Hurricane Sanitary and Stormwater Board, should not be introduced into the sewer system need not be handled by it.

As amended, Article 935 restricts discharges from sites used for the storage or disposal of a hazardous waste and prohibited hazardous substances. Hurricane, W.Va., Code § 935.27(c) (2014). Incorporating definitions provided in Article 1135 of the Municipal Code, § 935.27(c) prohibits discharges of "wastes" from facilities being used for "disposal" of any Hazardous Waste or "Prohibited Hazardous Substance" *unless* such discharge has been "authorized by and [is] in strict compliance with the terms and conditions of a permit issued" pursuant to § 935.29. *Id.*

With respect to these potentially harmful waste streams, § 935.29(a) introduces four options: (1) refuse to accept the waste into the City's sewer and POTW system; (2) issue a permit requiring pretreatment; (3) issue a permit requiring controls over the composition, quantities, and rates of discharge; or (4) issue a permit requiring payment of additional fees to cover added costs borne by the City for special monitoring, legal and technical oversight, handling, and treatment of wastes. Hurricane, W.Va., Code § 935.29(a). Subsection (b) explains that decisions under Article 935 should be made not only with regard to "assuring adequate protection of public health, safety, welfare, the environment and employee health and safety," but also with regard for the economic impacts on the user, then listing eight considered impacts to the sewer and POTW system. Hurricane, W.Va., Code § 935.29(b). Subsection (c) assures that the City Manager will take "prompt action" on applications for special permits under Article 935, though a particular time frame is not articulated. Hurricane, W.Va., Code § 935.27(c).

In addition to setting out a permitting process, Article 935 explains the process for issuing notices of violation and administrative review thereof. Section 935.42 explains authority for issuance of a NOV, including specifying that such notice must include findings of fact, conclusions of law, and a statement of the sanction sought and must be served at least 10 days

-6-

before a hearing is held on the NOV. Section 935.79(a) explains the process by which an entity receiving a NOV may request a stay of enforcement by written application to the Sanitary Stormwater Board or City Council. The process for commencing a hearing as a "first-level review" of any NOV is set out by § 935.80. Following "second-level review" by the City Council as explained in § 935.82, the City's determination on the matter becomes a "Final Action of the City for purposes of seeking of judicial review," Hurricane, W.Va., Code § 935.83, and that Final Action may be stayed pending judicial review, if sought. Hurricane, W.Va., Code § 935.84. Article 935 further specifies available civil and criminal penalties. Hurricane, W.Va., Code §§ 935.96 and 935.99.

**IV.** **Legal Standard**

Following Defendants' motion, this Court entered a temporary restraining order, pursuant to Federal Rule of Procedure 65(b), and now considers the propriety of issuing a preliminary injunction. "While a preliminary injunction preserves the status quo pending a final trial on the merits, a temporary restraining order is intended to preserve the status quo only until a preliminary injunction hearing can be held." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999).

In considering whether a preliminary injunction is appropriate, the Court first observes that "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–690 (2008)). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id.* (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)).

A party seeking a preliminary injunction "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. Of note, the Supreme Court has clarified that something more than a "possibility" of irreparable injury is required; the extraordinary remedy of injunctive relief "may only be awarded upon a *clear showing* that the [party seeking an injunction] is entitled to such relief." *Id.* (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curium) (emphasis added).

## V. Analysis

Before discussing each of the four requirements for injunctive relief, the Court notes that Article 935—the ordinance on which the NOV rests—is absent from the pleadings in the underlying action; and appropriately so, as the City's sewer-related enforcement attempt occurred well after filing of the Amended Complaint. Article 935 and the NOV do indeed reference Article 1135, but the Court is not convinced that consideration of matters related to the enforcement of Article 935 is within the existing jurisdictional scope of litigation as defined by the pleadings.

In justifying the attention of this Court, the Defendant argues that "Articles 935 and 1135 are intricately connected such that the one cannot be enforced without the other." ECF No. 50 at 2. Defendant characterizes the NOV as "[emanating] from and . . . closely related to this action," ECF No. 37, and to the extent that the NOV is an attempt to minimize potential threats to human health and safety related to the disposal of wastes, that is a fair characterization. That said, the City is also correct that the NOV "addresses an entirely different waste stream and an entirely different exposure pathway." ECF No. 41 at 1. While the underlying proceeding here seeks abatement of

alleged hazardous or nuisance conditions at the landfill itself, the NOV is an exercise of City authority relating to its sewer and POTW system and an attempt to prevent potentially harmful leachate from the landfill subsurface from entering that system. *Id.*

Notwithstanding the cross-references between Articles 935 and 1135, the two articles are independent regulatory schemes, each with a different scope and affording different remedies. Article 1135 addresses itself to nuisance concerns, while Article 935 is narrowly concerned with Sewer Rates and Regulations. That Article 935 relies on the drafting expediency of incorporating definitions from other sections of the municipal code does not render it "intricately connected" to the City's nuisance ordinance. For these reasons, the Court would doubt its authority to issue a preliminary injunction enjoining enforcement of Article 935 as outside the scope of the pleadings, but even assuming a sufficient connection to the pleadings, Defendants have not produced sufficient evidence supporting the factors required for a preliminary injunction, as explained below.

### A. Likelihood of Success

Defendants' likelihood of success in challenging Article 935 is scant for the simple reason that Defendants have been unable to point to any authority that would require the City to accept a particular waste into its sewer and POTW system. In contrast, Plaintiff directs the Court's attention to authority, as reviewed above, reserving discretion over what materials and wastes are accepted to the judgment and experience of the City's Sanitary and Stormwater Board. Without some concrete authority to the contrary being offered by Defendants, there is no reason to expect that the City may not exercise that discretion through the administrative processes lengthily described in Article 935.

Moreover, because Defendants have not fully availed themselves of that administrative process, it remains uncertain whether Defendants will even be wronged by that process in a manner necessitating judicial review. Defendants acknowledge that Article 935 indeed creates a mechanism for review of enforcement decisions, but argue they should be excused from exhaustion requirements. Defendants must do more than merely assert that that mechanism is futile; Defendants must adduce some evidence supporting that opinion.

Exhaustion of remedies is important precisely because it is a process. That process would enable the City to consider the particular activity at issue and the potential need to impose special permit conditions. While it is certainly understandable that Defendants fear an adverse determination by the City, *if* that fear materialized, it would amount to merely the beginning of the available process and not its intractable end. Of particular note, subsequent remedies would include eventual judicial review in state court—a process that surely cannot be presumed futile.

Not only is the Court without reason to presume futile or meaningless process, examining the City's conduct to date suggests quite the opposite. Rather than summarily declaring that Defendants' actions at DSI Landfill constitute a nuisance and forcing Defendants to seek remedies, the City, in cooperation with Putnam County, filed an action in federal court seeking approval of their shared nuisance determination. Defendants may have a reasonable suspicion that the mechanisms for review provided by Article 935 will not deliver the outcome desired, but that reasonable suspicion hardly supports a conclusion that pursuing such processes is futile.

### B. Irreparable Harm

As Defendants offered no authority suggesting that there is some authority requiring the City to accept whatever waste is sent to its sewer and POTW system, Defendants similarly offered no evidence supporting the assertion that DSI or WMWV would suffer irreparable harm if the City

-10-


was allowed to pursue enforcement of Article 935. Indeed, no evidence has been offered showing harm of any character, irreparable or otherwise.

In contrast, Plaintiff has adduced some evidence that it may suffer irreparable harm if forced to accept leachate from the DSI landfill without an opportunity to evaluate potential risks and impose special conditions, if determined to be necessary. The parties reasonably dispute whether such discharges would in fact be harmful or threaten harm, but that is arguably precisely the reason the City seeks to enforce Article 935. The possibility surely exists that upon review, the City may conclude no special conditions are necessary or may issue a special permit with reasonably burdensome conditions. Thus, any threatened irreparable harm evident in the record accrues to the City in the form of threatened loss of the ability to evaluate materials entering its sewer and POTW system such that it may meet its obligations under state and federal law.

### C. Balance of Equities

Defendants argue that the balance of equities factor weighs in their favor because Articles 935 and 1135 "are ex post facto and deprive [DSI and WMWV] of their constitutional rights and other property interests, for which there is no adequate remedy available at law." ECF No. 37 at 5. Defendants further assert that the ordinance(s) are preempted by state and federal law and that the ordinance(s) "would require Defendants to go to extreme lengths, at great cost, to abate activity which was previously approved and permitted by the WVDEP." *Id.*

Here again, the Court returns to the availability of administrative process of which Defendants have not thoroughly availed themselves. Upon seeking a permit, Defendants may well find little cause for complaint. Next, the activity which has been previously approved and permitted by the WVDEP is merely the disposal of particular wastes at the DSI Landfill. As

explained by Defendants' own witnesses, WVDEP enjoys no regulatory authority over what materials the City must accept into its sewer and POTW system.

Given that the remaining factors are unmet, the Court will reserve consideration of Defendants' argument that the Articles are ex post facto laws, again concerned that challenges to Article 935 are beyond the scope of the underlying litigation.

### D.  Public Interest

Even if consideration of the public interest factor were necessary, based on the evidence before the Court, there would be little more to say than that the factor does not conclusively weigh in either direction.  The Court can imagine the possibility that, were Defendants forced to disturb the settled waste, some negative effect to air quality or risk of additional exposure to surface waters might materialize.  It is also imaginable that landfill closure would cost the City and County an available disposal site for all manner of other wastes.  Either eventuality would suggest a public interest supporting the continued undisturbed operation of the DSI Landfill, but Defendants have adduced no evidence that either eventuality as imagined by the Court is a realistic concern.

Plaintiff asserts a counter-veiling public interest in the integrity and efficacy of the City's sewer and POTW system if required to treat materials it is ill-equipped to process.  Plaintiff further raises concerns about the health and safety of employees working in that system.  However, based on the evidence presented for purposes of considering a preliminary injunction, such concerns, while understandable, presently appear to be supported by imagination as much as fact insofar as neither party has yet to produce sampling results showing harmful—or even detectable—levels of MCHM at the DSI Landfill site or in leachate from the site.

## VI. Conclusion

Defendants have fallen well short of satisfying the four factors necessary to secure the extraordinary remedy of a preliminary injunction. Most glaring is the absence of any evidence of irreparable harm, but there is also similarly insufficient support for each of the remaining three factors.

For the foregoing reasons, Defendant's Motion for a Preliminary Injunction is **DENIED**, Plaintiff's Motion to Vacate the Temporary Restraining Order is **GRANTED**, and the Temporary Restraining Order is **LIFTED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER: December 8, 2014

_____
ROBERT C. CHAMBERS, CHIEF JUDGE